**GREATER KANSAS CITY LABORERS DISTRICT COUNCIL OF the INTERNATIONAL HOD CARRIERS, BUILDING AND COMMON LABORERS UNION OF AMERICA OF GREATER KANSAS CITY AND VICINITY, Plaintiff,**

v.

**BUILDERS' ASSOCIATION OF KANSAS CITY, Defendant.**

**No. 14156-1.**

United States District Court
W. D. Missouri, W. D.

Jan. 18, 1963.

John J. Manning, Robert S. Fousek, Kansas City, Mo., for plaintiff.

Spencer, Fane, Britt & Browne, Stanford C. Madden, Kansas City, Mo., for defendant.

JOHN W. OLIVER, District Judge.

The parties entered into a collective bargaining agreement effective June 17, 1960. By its terms it is to remain in full force and effect until at least March 31, 1965. That agreement declares that its purpose was "to prevent strikes and lockouts and to facilitate peaceful adjustment of grievances and disputes between employers and employees" and "to establish the necessary procedure by which those ends may be accomplished".

Article IX of the agreement, entitled "Arbitration", provided that:

"There shall be no stoppage of work on account of any differences which may occur between a member or members of the Association and the Union. If the matter cannot be adjusted between the parties involved, it shall be taken up between a representative of the Union, and a representative of the Association.

If then the matter cannot be settled satisfactorily, it shall be immediately referred to an Arbitration Board consisting of three members appointed by the Association and three members appointed by the Union. These six men shall have authority to choose a neutral third party who shall act as arbiter and the decision of the arbiter shall be final and binding upon both parties and must be in writing."

Article VI of the agreement, entitled "Health and Welfare", provided that:

"Effective April 1, 1962, ten cents (10¢) per hour for all classifications shall be paid by employers into a health and welfare insurance program in accordance with a Trust Agreement to be agreed upon between the parties.

"At the time of the establishment of such Health and Welfare Plan, provisions may be inserted in this Agreement to authorize suit for the collection of any delinquent accounts owing to such Health & Welfare Fund."

Plaintiff's complaint in this Court alleges that since the execution of the agreement the parties "have been unable to agree to a Trust Agreement as provided by Article VI" of the agreement. Plaintiff alleges further that since "April 1, 1962, plaintiff has repeatedly requested defendant to arbitrate the dispute which has arisen under Article VI of the agreement, pursuant to the provisions of the contract set forth in Article IX" and that "defendant has failed and refused to agree to arbitrate or to take any steps toward arbitrating the dispute which exists under the agreement". Plaintiff prays for an order "directing the defendant to arbitrate the dispute * * * and for such further relief as this Court may deem appropriate under the premises".

Defendant's motion to dismiss alleges that plaintiff's complaint should be dismissed because "the issue or dispute concerning Article VI * * * are out-

side the scope of the arbitration clause of the collective bargaining agreement (Article IX)" and because "the complaint asks a judicial enforcement of arbitration concerning prospective or future terms of a contract or Trust Agreement, and is not enforceable under Section 301 of the Labor Management Relations Act of 1947".

■ As did Judge Henley in Couch v. Prescolite Manufacturing Corporation, W.D.Ark.1961, 191 F.Supp. 737, 739, we shall, as authorized by Rule 12(b) of the Rules of Civil Procedure, treat defendant's motion to dismiss as a motion for summary judgment in order that the entire collective bargaining agreement be a part of the record.

Almost contemporaneously with the effective date of the agreement here involved but before the agreement was actually signed, the Supreme Court of the United States handed down its decisions in United Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed. 2d 1403 (1960), United Steelworkers v. Warrior & Gulf Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) and United Steelworkers v. Enterprise Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Those cases but added to the development of the enforcement of the federal policy relating to the enforcement of labor agreements as announced both by the Congress in 1947 and by the Supreme Court in three earlier cases decided in 1957. Those cases, Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972 (1957), General Electric Co. v. Local 205, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957), and Goodall-Sanford v. Textile Workers, 363 U.S. 550, 77 S.Ct. 920, 1 L.Ed.2d 1031 (1957), should also be read with the still later cases of Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962) and Drake Bakeries v. Local 50, Bakery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962), in order to obtain a full view of the rapid development of the development of the developments that have occurred in this area of labor law since 1957.

In Lincoln Mills, the Supreme Court noted (353 U.S. l. c. 454, 77 S.Ct. l. c. 916, 1 L.Ed.2d 972) that the Congressional philosophy of § 301 was well summed up on page 17 of Senate Report No. 105, 80th Congress, 1st Session. It was there stated:

"Statutory recognition of the collective agreement as a valid, binding, and enforceable contract is a logical and necessary step. It will promote a higher degree of responsibility upon the parties to such agreements, and will thereby promote industrial peace."

And more importantly for this case, Lincoln Mills held (353 U.S. l. c. 455, 77 S.Ct. l. c. 917, 1 L.Ed.2d 972) that the legislation "expresses a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way". Lincoln Mills also requires (353 U.S. l. c. 456, 77 S.Ct. l. c. 917, 1 L.Ed.2d 972) that "the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws". And "judicial inventiveness" on the part of the federal courts is invited, dependent, of course, upon the nature of the problem involved (353 U.S. l. c. 457, 77 S.Ct. l. c. 918, 1 L.Ed.2d 972).

American emphasized what was said earlier in Lincoln Mills and held (363 U.S. l. c. 566, 80 S.Ct. l. c. 1345, 4 L.Ed. 2d 1403) that the national labor policy established by the Labor Management Relations Act of 1947 "can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play". And, if arbitration is provided for by the parties themselves, "the function of the court is very limited" and "is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract" (363 U.S. l. c.

567–568, 80 S.Ct. l. c. 1346–1347, 4 L.Ed. 2d 1403). Mr. Justice Brennan, in his concurring opinion, cautions that "[t]he meaning of the arbitration promise is not to be found simply by reference to the dictionary definitions of the words the parties use, or by reference to the interpretation of commercial arbitration clauses" (363 U.S. l. c. 570, 80 S.Ct. l. c. 1347, 4 L.Ed.2d 1403). But even though the words in a collective bargaining agreement are to be "rightly viewed by the Court to be the charter instrument of a system of industrial self-government, like words in a statute, and are to be understood only by reference to the background which gave rise to their inclusion"; nevertheless, we are admonished not to forget that "since arbitration is a creature of contract, a court must always inquire, when a party seeks to invoke its aid to force a reluctant party to the arbitration table, whether the parties have agreed to arbitrate the particular dispute" and to remember that "the question of whether a dispute is 'arbitrable' is inescapably for the court".

In Warrior, the labor agreement provided, in language not dissimilar from the agreement involved in this case, that "[s]hould differences arise * * * as to the meaning and application of the provisions of this Agreement, *or should any local trouble of any kind arise*", that upon failure to reach a settlement by negotiation, "the matter shall be referred to an impartial umpire for decision".

In reversing the District Court which refused to compel the company to arbitrate, Warrior held that "the hostility evinced by courts toward arbitration of commercial agreements has no place here" because "arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself" (363 U.S. l. c. 578, 80 S.Ct. l. c. 1350, 4 L.Ed.2d 1409). Warrior recognized the facts of industrial strife and life when it accepted the late Dean Shulman's comment that the parties to a labor agreement, unlike the parties to an ordinary commercial contract, in order that some agreement be

signed, are sometimes forced to agree to provisions that sometimes "do little more than leave problems to future consideration with an expression of hope and good faith". See Shulman, Reason, Contract and Law in Labor Relations, 68 Harv.L.Rev. 999 (1955), at 1005, quoted on page 580 of 363 U.S., on page 1352 of 80 S.Ct., 4 L.Ed.2d 1409 of Warrior. And cf. Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482 (1959), approvingly cited on page 579 of 363 U.S., on page 1351 of 80 S.Ct., 4 L.Ed.2d 1409 of Warrior.

The majority opinion in Warrior expresses much the same thought as that quoted from Mr. Justice Brennan's concurring opinion in American as to the function and scope of the judicial inquiry that is to be made in an action to enforce an arbitration agreement. After noting that "[t]he Congress, * * * has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate", Warrior held that because "arbitration is a matter of contract * * * a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit".

But such a statement does not change the narrow scope of judicial inquiry commanded by § 301. Warrior was explicit in establishing the standards of judgment to be applied and followed (363 U.S. l. c. 582, 80 S.Ct. l. c. 1352, 1353, 4 L.Ed.2d 1409):

> "Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an

interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

And more specifically, the Supreme Court held in Warrior that:

"Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement."

To which must be added this further expression on exclusion:

"In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, * * *."

And, as to what action a District Court must take if it concludes that there is no real doubt but that the arbitration clause is broad enough to cover the dispute, Mr. Justice Brennan, concurring in American, held (363 U.S. l. c. 571, 80 S.Ct. l. c. 1364, 4 L.Ed.2d 1403):

"On examining the arbitration clause, the court may conclude that it commits to arbitration any 'dispute, difference, disagreement, or controversy of any nature or character.' With that finding the court will have exhausted its function, except to order the reluctant party to arbitration."

 Stated simply, our judicial inquiry is "strictly confined" by Congress and the Supreme Court to an examination of the parties' complete intent and our determination of that question is to be aided by our resolution of doubt in favor of coverage, particularly when it can not be said with "positive assurance that the arbitration clause is not susceptible of an interpretation" of coverage and particularly when the parties have not "specifically excluded" the arbitration of the particular difference involved. In the latter situation "only the most forceful evidence of a purpose to exclude" must be present before we can deny coverage.[1]

 Apart from the exact language of the agreement, it would seem to us that the only reasonable inference that can be drawn from the data before us is that the parties effectuated a truce when they agreed upon Article VI of their present agreement in 1960. Ten cents an hour was agreed upon as the amount employers were to pay "into a health and welfare insurance program" but payments were not to begin until April 1, 1962. Such was the message that the negotiators took back to their principals in order to obtain approval of the contract.[2] The details of how that was to

---

1. We do not believe it necessary in this case to analyze in detail the two cases decided by the Supreme Court in June of this year. Those cases applied the doctrines announced in the cases just discussed. Atkinson v. Sinclair Refining Co., supra, fell factually on one side of the line; Drake Bakeries on the other. For comment consistent with our analysis of the cases decided by the Supreme Court in 1957 and 1960, see the new text added to § 1930, on page 142 of the 1962 Cumulative Supplement to Vol. Six of Williston on Contracts, and Isaacson, The Grand Equation: Labor Arbitration and the No-Strike Clause, October, 1962, 48 Am.Bar Assn.Jr. 914.

2. Shulman, supra, at 1004–5, we think correctly points out that "while the interpretations or explanations made at the

membership meetings can hardly bind the employer, it is nevertheless important that the agreement be not such as to become a promise to the ear but a disappointment to the hope of the membership". And Cox suggests, we also think correctly, that the principle applicable to both parties in all contracts (stated in § 570 of Williston on Contracts) to the effect that "in every contract there exists an implied covenant of good faith and fair dealing", is particularly applicable to collective bargaining agreements. See also Mr. Justice Brennan's concurring opinion in American, supra, where he commented on the "implied covenants of good faith and fair dealing" to which the parties to a collective bargaining agreement are to be judicially held.

be worked out were left to the draftsmen of the agreement and to their lawyers. The agreement eventually provided that "ten cents (10¢) per hour * * * (would) be paid * * * into a health and welfare insurance program in accordance with a Trust Agreement to be agreed upon between the parties".

And what must be said as to the intention of the parties in the event differences arose between them as to the exact terms of the Trust Agreement? Certainly neither party can now say that the provisions of the arbitration clause would not come immediately into play. How else can and will the problem ever be settled? And settled it must be if the policy of the Congress in regard to arbitration clauses in collective bargaining agreements is carried out in accordance with the law of the land as declared by the Supreme Court of the United States in the cases we have cited.

The language used by the parties in Article IX is as broad as could be chosen. They voluntarily agreed that "any differences" were to be arbitrated. That clause is as broad, if not more broad than the clauses involved in Warrior, in Signal-Stat Corporation v. Local 475, 2 Cir., 1956, 235 F.2d 298, in Yale & Towne Mfg. Co. v. Local Lodge No. 1717, 3 Cir., 1962, 299 F.2d 882, in Butte Miner's Union No. 1 v. Anaconda Company, D.C.Mont. 1958, 159 F.Supp. 431, and in Tenney Engineering Inc. v. United Elec. R. & M. Wkrs., D.C.N.J.1959, 174 F.Supp. 878. And certainly Cox, supra, at 1501, stated a truism when he said that "experienced negotiators are thoroughly aware of their ability to choose between the comparatively narrow clause * * * covering only 'disputes concerning the in-

terpretation and application' of the collective bargaining agreement * * * and a wide open undertaking to arbitrate 'any dispute, difference, disagreement or controversy of any nature or character' which may arise during the term of the agreement".

For the uninitiated, Cox, at 1508, explains in regard to a "wide open" arbitration that "an undertaking to arbitrate 'any dispute, difference, disagreement, or controversy of any nature or character' is certainly broad enough to cover disputes about the meaning of the arbitration clause; if either party refuses to submit a question of arbitrability to arbitration, there is the breach of promise necessary for judicial relief".

We can not think of any language that could have been used in the agreement before us that would express any broader intention to arbitrate any differences that might arise between the parties during the life of the agreement.[3]

Had the parties intended to exclude all differences except those confined to the "interpretation or application of the existing contract" they would have so provided. They did not do so, with the result that there are no doubts to resolve in this case. If doubts were present, created either by reason of the language of the agreement or by other possible factual circumstances that would tend to support the idea that there could have been an intention to exclude the particular difference from the coverage of the arbitration clause, we would have a different case.

In dealing with such a different case we would be required to determine whether there is any "forceful evidence

3. Defendant's argument about the alleged complexity of what is now a not uncommon part of many labor agreements expresses a lack of confidence in the whole procedure of arbitration that is contrary to defendant's agreement to the broadest sort of an arbitration clause. We are confident that both parties were and are familiar with the fact that it is not revoluntary for parties to agree that health and welfare Trust Agreements are to be the subject of arbitration. See also, Empire State Master Hairdressers' Assn., Inc. v. Journeymen Barbers, etc., where the New York Supreme Court, 231 N.Y.S.2d 662; Id., App.Div., 236 N.Y.S.2d 371, sent the negotiation of a health and welfare fund to arbitration.

of a purpose to exclude the claim from arbitration" for we cannot, under the mandate of Warrior, adversely resolve the doubts in favor of coverage "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute". We therefore do not reach in this case the question of what procedure is to be followed in a case in which we would be required to resolve possible doubts that might have been created by the language of the agreement.[4]

The cases relied upon by defendant are not, with one possible exception, inconsistent with our decision of this case. We would have ruled Couch v. Prescolite Manufacturing Corporation, supra, as did Judge Henley because there the limitation of the arbitration clause was not only confined to the "interpretation or meaning of any written provision of this agreement", but another clause of the contract provided, as Judge Henley twice mentioned, that the parties had expressly agreed to arbitrate certain particular wages when the contract was negotiated. Those wages were not the ones involved in the dispute, all of which supported the inference that the omission of any express agreement to arbitrate the future wages evidenced an intent that they were excluded from the scope of the arbitration clause. We would not, however, have accepted Boston Printing Pressman's Union v. Potter Press, D.C.Mass.1956, 141 F.Supp. 553,

affirmed 1 Cir., 1957, 241 F.2d 787, cert. den. 355 U.S. 817, 78 S.Ct. 21, 2 L.Ed.2d 34, as did Judge Henley. We think both the force and the validity of Judge Wyzanski's fear about "judges * * * exercising quasi-legislative magistracy over labor problems of uncertain dimension" is dispelled by what the Supreme Court has held since Judge Wyzanski was pioneering in this not uncomplicated field of law.[5]

Communication Wks. of Amer. v. New York Telephone Co., S.D.N.Y.1962, 209 F.Supp. 389, is similarly distinguishable because there the parties expressly provided that "any grievance or dispute arising out of this Section 9.08 be subject to the arbitration provisions of this agreement". The grievance was one that involved that section and Judge Tyler held on the facts, as I would have also held on the facts, that "the exclusionary language in Section 9.08 * * * is clear beyond reasonable dispute and thus controlling". Pacific Northwest Bell Telephone Co. v. Communication Workers, 9 Cir., 1962, 310 F.2d 244, unlike Judge Tyler's case, and unlike this case, involved a case where there was a reasonable dispute as to the intention of the parties as expressed in their agreement. The Ninth Circuit reversed the District Judge who, under those factual circumstances, "excluded from evidence history of the bargaining from which the contract resulted". The Court of Appeals ordered the District Court to follow the sort of procedure that we indicated in

4. We do not, however, anticipate any particular difficulty in formulating proper preliminary procedural steps to be taken in such a case because we have a wealth of federal precedent built up in the not dissimilar situations that involve the scope of our preliminary judicial inquiry into general federal jurisdictional questions; that require preliminary resolution of our bankruptcy plenary or summary jurisdiction; and many others which require our determination of preliminary questions of law which sometimes require factual determinations before we act.

5. Even before the Supreme Court decisions, it is apparent that some federal judges did not share Judge Wyzanski's fear. See, for example, Northland Greyhound Lines v. Amalgamated Assn., Etc., D.C.Minn.1946, 66 F.Supp. 431, appeal dismissed 8th Cir., 1946, 157 F.2d 329, where Judge Joyce ordered the parties to arbitrate hours, wages and working conditions. And it is also interesting to note that while Mr. Justice Frankfurter vigorously dissented in Lincoln Mills, on grounds not dissimilar to those expressed by Judge Wyzanski, he concurred in all the 1960 decisions of the Supreme Court cited in this memorandum.

footnote 4 we would follow in a doubtful case if one were presented to us. This case, involving clauses about which there can be no reasonable doubt, is not such a case.

Rule 12(b) provides that should we treat a motion to dismiss as a motion for summary judgment, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56". The wisdom of that rule is demonstrated by the fact that the Court needs additional guidance from counsel for both sides both as to the substance and the form of order that should be entered in this case. It is apparent from defendant's suggestions in support of its motion that in spite of the fact that federal law controls, the parties have instituted certain litigation in the State court and that at least some of that litigation is on the way to the Supreme Court of Missouri.[6]

It is obvious that the fundamental differences between the parties in regard to the Trust Agreement of which this case is apparently but one facet, are not going to be settled until the parties get out of this and other courts of law and commence, in good faith, to follow their agreed procedures of negotiation and arbitration. Whether we can take official judicial notice of the fact or not, we cannot erase from our private memory as a citizen our recollection that the collective bargaining agreement involved in this case was entered into only after months of unlimited legal and economic warfare between the parties and that while the agreement was made "effective June 17, 1960" it was not actually executed until long after that date. At any rate, and without the application of any judicial notice doctrine, it is clear beyond reasonable doubt that the parties did agree to settle their differences by agreeing that until March 31, 1965 "there shall be no stoppage of work on account of any differences which may occur"; by agreeing that the details concerning the Trust Agreement would be "agreed upon between the parties", and by agreeing that should "any differences" arise in connection with that or any other matter, the parties would proceed to "final and binding" arbitration.

In so doing, the parties adopted a method and a policy for the settlement of their economic quarrels that is approved and required by both the Congress and the Supreme Court of the United States. That policy is, in the language of Dean Shulman:

" * * * an integral part of the system of self-government. And the system is designed to aid management in its quest for efficiency, to assist union leadership in its participation in the enterprise, and to secure justice for the employees. It is a means of making collective bargaining work and thus preserving private enterprise in a free government."

Courts cannot force the parties to be reasonable.[7] But courts can force the parties to use the means of settlement that they have agreed to use in the event

6. Defendant, in a footnote, also informs us that it looks forward to even further and more lengthy complicated litigation because it forecasts that "the nature of the proceedings and relief sought in the State court proceeding give rise to possible additional contentions against plaintiff's complaint in this case, but these contentions must necessarily await a determination on the motion to dismiss filed by defendant in this proceeding".

7. See Shulman, supra, at 1024, where he suggests that: " * * * the courts cannot, by occasional sporadic decision, restore the parties' continuing relationship; and their intervention in such cases may seriously affect the going systems of self-government. When their autonomous system breaks down, might not the parties better be left to the usual methods for adjustment of labor disputes rather than to court actions on the contract or on the arbitration award? I suggest that the law stay out—but, mind you, not the lawyers."

the usual processes of collective bargaining prove, for any reason, to be ineffectual. Courts must, however, also recognize the distilled wisdom in the adage about the inclination of a horse's desire to quench his thirst.

As we have suggested, this Court is in need of the suggestions of counsel as to how the obstacles that stand in the way of orderly negotiation and arbitration are to be removed. They are necessarily better informed as "to the nature of the problem", but we are all to remember that the available "range of judicial inventiveness", to borrow again the language of Mr. Justice Douglas in Lincoln Mills, is unlimited.

In the exercise, therefore, of both our inherent equity power (see Mr. Justice Burton's concurring opinion in Lincoln Mills, 353 U.S. at 460, 77 S.Ct. at 919, 920, 1 L.Ed.2d 972) and the power conferred by Rule 56(d) to direct such further proceedings in the action as are just, we do hereby order that:

1. The parties shall be allowed twenty (20) days in which to explore the possibility of whether they may, consistent with what we have determined in this memorandum and order, suggest an agreed form of order for approval of this Court, that will provide for the dismissal of all pending litigation in this or any other court, and which will provide a time schedule for collective bargaining in regard to the terms that shall be included in the Trust Agreement, together with an express provision that should an agreement not be reached by a day certain, that the matter shall then be immediately referred to an Arbitration Board selected in accordance with Article IX of the agreement between the parties. The names of the persons who will serve on the Arbitration Board shall be named in the proposed order.

2. Should the parties be unable to agree on a proposed order, then they shall, within twenty-five (25) days of the date of this Memorandum and Order, file whatever matters permitted to be filed by Rule 56, together with a suggested form of order that each party believes should be entered. Should such a proposed order include a provision that would require the exercise of our *in personam* equity jurisdiction, in order that any party be directed, on pain of contempt, to dismiss or take other action in connection with any litigation pending in any court other than this Court, such party shall also submit a brief which shall cite the legal authorities in support of such a provision in their proposed order.

3. Should counsel desire any clarification of the requirements of this order, we will be happy to schedule an informal conference with both parties at a convenient time.

IT IS SO ORDERED.