**AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, AFL–CIO, Plaintiff,**

v.

**TAFT BROADCASTING COMPANY, STATION WDAF, Defendant.**

**No. 19958–1.**

United States District Court, W. D. Missouri, W. D.

Dec. 20, 1973.

C. David Whipple, Krings, Stewart, Whipple, Mauer & Eisler, Kansas City, Mo., for plaintiff.

James R. Willard, Spencer, Fane, Britt & Browne, Kansas City, Mo., Frank H. Stewart, Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

### I.

This Section 301 action to compel arbitration of an agreement which plaintiff alleges is contained in an "Interim Agreement" between the parties pends on the parties' cross-motions for summary judgment. The parties entered into a full stipulation of facts in which they agreed that "there are no other relevant facts pertinent to the Court making a determination on the motions for Summary Judgment" (paragraph 48 of the stipulation). Defendant's brief implicitly agrees that plaintiff's accurately summarized the following factual data from the stipulation of the parties:

Plaintiff represents a unit of employees at defendant's stations WDAF–AM–FM–TV as their collective bargaining agent. Said collective bargaining agreement entered into on July 1, 1963 to which the defendant was bound as a successor, expired on September 30, 1965. This contract was extended until December, 1965, and subsequently on December 12, 1965 the Union called a strike which lasted until April 18, 1966, when a strike settlement agreement was entered into.

On June 22, 1966, the defendant transmitted to the plaintiff its formal draft version of the strike settlement agreement. This June draft was never executed by the parties due to alleged discrepancies between the strike settlement agreement and the finished document.

Thereafter, on April 3, 1967, defendant's attorney, James Willard, sent a letter to David H. Schnabel, Executive Secretary of the Union, which stated, inter alia, as follows:

. . . regarding the execution of the understanding reached between Taft Broadcasting Company, Kansas City, Missouri, and the Kansas City Local of AFTRA, as reflected by the draft contract of June 22, 1966. A reasonable length of time having long since elapsed since the draft was sub-

mitted to you for signature without acceptance by you, the proposals therein contained are now withdrawn, and we are rescinding any understanding or agreement between the parties which may have been reached on April 18, 1966, as reflected in the draft of June 22, 1966.

For your information and the information of the affected employees, it is our intention to continue in effect the wages, hours, and other conditions of employment presently in effect as fully set forth in the draft of June 22, 1966, and *we will continue handling any grievances that may arise in accordance with the procedure set forth therein.* There can, of course, be no enforcement of the union security provisions.

We do not by this letter attempt or purport to withdraw recognition from your union as the exclusive bargaining representative of our employees in an appropriate unit, and we are prepared to negotiate with you in good faith in order to reach a satisfactory collective bargaining contract. *In the meantime, if we feel any change is desirable which may affect the present wages, hours, and working conditions of our employees, we will advise you in advance so that you will have the opportunity to negotiate on it before any changes are made.* [Emphasis added]

The Union made no response to this letter.

On or about February 2, 1968, defendant ended the employment of Martin Gray, a staff announcer who had been in the employ of defendant from on or about July 13, 1963.

On March 4, 1968, the plaintiff Union wrote a letter to the defendant stating in part the following:

On February 2, 1968, WDAF–Radio reduced its announcing staff. Within less than two weeks the station again added to its announcing staff, . . . by hiring a new announcer

rather than recalling Mr. Gray to work. . . .

This layoff out of seniority, the failure to recall according to seniority and the change in computation of accrued vacation are all unilateral changes in wages, hours, and/or conditions of employment illegally instituted by the Station. [TXD 3, J.Ex. 16]

On or about March 22, 1968, defendant made a written reply to the Union's March 4 letter stating that Gray was not laid off, but rather, he was terminated when the station discontinued the all-night show on which he was the announcer and that the demand that Mr. Gray be reinstated would be denied. On or about May 14, 1968, the plaintiff again wrote a letter to the defendant stating:

The number of staff announcers employed by the Station on February 1, 1968, was reduced by one when, on February 2nd, the Station ended the employment of announcer Gray. This obviously was a reduction of staff which should have been done by seniority.

By letter dated June 14, 1968, the defendant again asserted Mr. Gray was terminated due to a decision by the station to discontinue its live all-night show, and further asserted that announcer Mark Foster was hired prior to February 2, 1968. Thereafter, on or about July 3, 1968, the plaintiff served the defendant with a written demand for arbitration regarding the matters involving termination of announcer Martin Gray and alleged noncompliance by defendant with the annual earnings guarantee. After the plaintiff had expressly renewed this demand for arbitration in a letter dated and sent to defendant on or about July 17, 1968, defendant sent the following, dated July 22, 1968:

Receipt is acknowledged of your letter of July 3, in which you request a meeting to select an arbitrator to hear a "grievance" arising out of the termination of Martin Gray and an-

other arising out of an annual earnings guarantee. The request contained in your letter is denied.

As you know, the duty to arbitrate arises out of a contract. There is no executed document between your organization and our stations containing an agreement to arbitrate. .

The National Labor Relations Board considered these same facts in the case at 185 N.L.R.B. No. 68 (17–CA–3637) and found:

It is apparent on the basis of the record herein that Respondent on April 3, 1967, gave unequivocal notice to the Union that the April 18, 1966 agreement as reflected in the draft of June 22, 1966, was no longer in effect. It is also apparent from the. Union's subsequent conduct that it acquiesced in the Respondent's rescission of the strike settlement agreement, and accepted Respondent's further offer of an *interim agreement* as to both *substance* and negotiating procedure as outlined in the rescission notice, namely: that the terms and conditions of employment which were then in effect as set forth in the June 22, 1966 draft, including the procedures prescribed therein for the handling of grievances but not the union security provisions, would remain unaltered in the absence of prior notice and opportunity to bargain being afforded to the union.

. . . Accordingly, in view of the Union's acquiescence and acceptance of the statements in that letter, (the letter from the defendant's attorney Willard to the plaintiff dated April 3, 1967, J. Exhibit 2) as revealed by its subsequent conduct, we find that in April, 1967, the parties had come to an interim agreement, including a specific understanding that the grievance and arbitration machinery would continue in effect unless and until opportunity had been afforded to negotiate regarding any proposed changes therein. [emphasis added].

Defendant filed a Petition for Review from this decision to the Eighth Circuit Court of Appeals and the National Labor Relations Board filed a cross-petition for enforcement. The Eighth Circuit Court of Appeals dismissed the Petition for Review and enforced the Board's order. Taft Broadcasting Co. v. NLRB, 441 F. 2d 1382 (8th Cir. 1971). In the Eighth Circuit decision Judge Aldrich acknowledged that the Board had found that there existed an "interim agreement" to arbitrate and resolve grievances and further stated that:

In this context the letter can properly be regarded as an offering, at the same time, to continue, at least for a while, certain practices. While in one breath Taft asserts that the letter could not ripen into a contract unless the union formally accepted it, in the next it says, quite correctly, that "[T]he letter calls for no response on the union's part, either by action or by reply." Although Taft would draw different conclusions from this fact, we conclude that the Board could properly find that the union's inaction was, contractually, just what was called for. [441 F.2d at 1385].

Subsequently, plaintiff renewed its request that the two contested grievances be submitted to arbitration. When defendant refused, plaintiff filed the present § 301 action to compel arbitration of these grievances.

II.

In Greater Kansas City Laborers District Council v. Builders Association, 213 F.Supp. 429 (W.D.Mo.1963), after reviewing the *Steelworkers* trilogy and related cases, we concluded:

Stated simply, our judicial inquiry is "strictly confined" by Congress and the Supreme Court to an examination of the parties' complete intent and our determination of that question is to be aided by our resolution of doubt in favor of coverage, particularly when it cannot be said with "positive assurance that the arbitration clause is not

susceptible of an interpretation of coverage and particularly when the parties have not "specifically excluded" the arbitration of the particular difference involved. In the latter situation "only the most forceful evidence of a purpose to exclude" must be present before we can deny coverage. [213 F.Supp. at 433]

The principles stated in *Builders Association* have been most recently applied by the Eighth Circuit in Local No. 4, IBEW v. Radio Thirteen-Eighty, Inc., 469 F.2d 610 (8th Cir. 1972), which stated that:

The basic principles governing this case are well established. Congress and the Supreme Court have expressed a clear preference for contractual grievance procedures as a means of settling labor disputes. [Citations omitted] Where an exclusion-from-arbitration clause is vague, and the arbitration clause quite broad, only the most forceful evidence of a purpose to exclude the claim from arbitration will deter a court from directing the dispute to arbitration. [Citations omitted] Where the contract is not susceptible to a construction that the parties had agreed to arbitrate the dispute in question, arbitration will not be ordered. [Citations omitted] Under § 301 of the Labor Management Relations Act, the courts are assigned the duty of determining, in a given case, whether the parties have agreed to arbitrate and whether the reluctant party has breached that agreement. [469 F.2d at 613–614]

In regard to the contractual relationship of the parties, the Eighth Circuit, consistent with the earlier finding of the NLRB, concluded that the defendant's letter of April 3, 1967 and plaintiff's subsequent acquiescence "was the basis for an interim agreement that the various enumerated terms and conditions of employment set out in the June 22 draft, as well as the grievance procedures detailed therein, would continue in effect unless the union was given an opportunity to negotiate over any change." [441 F.2d at 1384].

The Supreme Court recognized in UAW Local No. 5 v. Scofield, 382 U.S. 205, 213, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965) that a finding in a Board proceeding may not under all circumstances be binding under technical *res judicata* rules in a later action between different parties who had not intervened in the first proceeding. The Court nevertheless noted that the former decision "will surely have an impact upon a later decision" in the § 301 suit. 382 U.S. at 220, 86 S.Ct. at 383. Indeed, the Supreme Court concluded that the court in a subsequent proceeding "would almost invariably defer to the initial decision as a matter of *stare decisis* or of comity." 382 U.S. at 213, 86 S.Ct. at 379.

After a careful analysis of the record and the arguments of the parties in this case, we find ourselves in agreement with both the Board and the Eighth Circuit. We therefore conclude, for the reasons stated by those tribunals, that at the time of the defendant's refusal to arbitrate, the parties were bound by the grievance procedure proposed in the June 22, 1966 draft agreement.[1]

Section I, Article VI of the June 22, 1966 proposal, incorporated into the in-

1. The same conclusion is reached by application of the rule articulated by several courts that where an NLRB finding on a material issue was reached in a proceeding fully complying with due process standards, and is fully supported by substantial evidence on the record, collateral estoppel bars further litigation between the parties on the litigated issue. See Texaco, Inc. v. Operative Plasterers and Cement Masons International Union, Local 685, 472 F.2d 594 (5th Cir. 1973); Paramount Transportation Systems v. Teamsters, Local 150, 436 F.2d 1064 (9th Cir. 1971); Painters District Council No. 38 v. Edgewood Contracting Co., 416 F.2d 1081 (5th Cir. 1969); International Wire v. IBEW, Local 38, 357 F.Supp. 1018 (N.D.Ohio 1972); and Purvis v. Great Falls Building and Construction Trades Council, 266 F.Supp. 661 (D. Mont.1967).

We recognize and apply that rule as an alternate ground to support our finding and conclusion in regard to the interim agreement.

terim agreement by the April 3, 1967 letter, provides that the arbitration procedure be used:

In the event of any difference of opinion between the parties hereto, or between the COMPANY and the employees covered by this agreement, as to the interpretation or performance of this Agreement, or the rights of the respective parties to this agreement, including, but without being limited to any controversy as to rates of pay, wages, hours or other conditions of employment . . .

Article VII contains no exclusions from this procedure. However, Article VI of Section I states that:

(b) Dismissal of any artists by the COMPANY shall be for just cause only.

(1) With regard to announcers only, just cause shall include, because of the special nature of the broadcast industry, termination of an announcer because of a change in programming, unsatisfactory ratings or other sufficient reasons relating to the efficient operation of the stations. Because of the nature of the industry, such decisions must be made by the stations' general managers and shall not be subject to the grievance and arbitration provision of this Agreement . . . .

\*   \*   \*   \*   \*   \*

(c) Layoffs for reduction of staff shall be based upon seniority within categories hereunder, namely, announcers, newscasters, directors and floor managers.

The intent of the parties is clear. While both sides recognized the value of a broad arbitration clause, they also recognized that the "special nature of the broadcast industry" required that management be allowed unreviewable discretion in terminating announcers. Because judgments in this area are highly subjective and conjectural, the parties concluded that submission of such decisions to arbitration would be unworkable.

It is also clear, however, that the parties recognized that not all personnel adjustments concerning announcers involved such judgments. A station manager might well decide on a "reduction of staff," within the meaning of Article VI(c), without being dissatisfied with any specific announcer, within the meaning of Article VI(b)(1). In such situations, the parties agreed that the layoffs, including announcers, would be governed by seniority, and that the decision concerning such a layoff would be subject to the normal arbitration process.

The defendant argues that Gray's dismissal clearly falls within the provision of Article VI(b)(1) of the interim agreement.[2] Defendant argues, on the facts, that at the time of Gray's dismissal, the station was changing its entire format. Gray was terminated, they claim, because his ratings were low, because he was not an established daytime announcer, and because his broadcasting style did not fit the new format. Moreover, they argue that Gray's dismissal could not have been a "layoff for reduction of staff" since there was no net reduction in the number of announcers. The factual record, of course, contains substantial evidence to support these contentions.

But the record also contains substantial evidence from which a contrary conclusion could be drawn. In the service letter prepared by the station's general manager to advise Gray of the reasons for his dismissal, for example, it was stated that:

On February 2, 1968 your employment was terminated by Taft Broadcasting Company due to a reduction in announcing staff by WDAF. This reduction was caused by a decision to discontinue all-night live broadcasting on the station. Since you were the announcer on this late night show, your job was necessarily eliminated by the change in programming.

While this letter is open to different interpretations, one could read it as sig-

---

2. We need not separately consider the arbitrability of the guaranteed annual earnings issue, since the defendant concedes that it is arbitrable provided the Court finds, as we have, the existence of a general agreement to arbitrate.

nifying a "layoff for reduction of staff" due to a cut-back in broadcasting hours. Such a reading would be consistent with a like reading of a letter of introduction written by the defendant's program director on Gray's behalf which stated in part:

> The termination of his employment at WDAF was not due to any dissatisfaction with him or his work, but was due solely to a reduction in staff necessitated by economic reasons.

■■ While the existence of two alternative interpretations, one permitting, and the other preventing, arbitration is not, *ipso facto*, determinative, this Court, under such circumstances, will direct the parties to arbitrate unless it can "positively declare that the parties intended to exclude the dispute from arbitration." Strauss v. Silvercup Bakers, Inc., 353 F.2d 555, 558 (2nd Cir. 1965). Based on the evidence discussed above, and the remainder of the record, we cannot say with "positive assurance" that the dispute falls within the exclusion contained in Article VI(b)(1)

We do not, of course, express or intimate any view on the merits of the dispute. The arbitrator will be presented with and should first determine the threshold question of whether Gray's termination was a "dismissal for just cause" or a "layoff for reduction of staff," within the meaning of Article VI(c). If he finds it to fall in the former category, his task is ended since he is foreclosed from inquiring into that decision. If he finds the latter situation, he must then determine whether, under all the factual circumstances, Gray's dismissal was in violation of Section VI(c). Cf. Camden Industries Co. v. Carpenters Local No. 1688, 353 F.2d 178 (1st Cir. 1965); Los Angeles Paper Bag Co. v. Printing Specialties etc. Union, 345 F.2d 757 (9th Cir. 1965).

### III.

Our holding above disposes of most of the parties' contentions. Two other matters merit brief consideration.

Defendant argues that plaintiff should have exercised its right to intervene in the Eighth Circuit review proceedings to raise the issues involved in this action. Since plaintiff did not, defendant contends that it should not now be permitted to continue this litigation. Defendant bases this argument on UAW Local No. 5 v. Scofield, *supra,* and the consolidated case of NLRB v. Fafnir Bearing Co., which hold that a successful charging party in an NLRB proceeding has a right to intervene in a Court of Appeals review of a Board decision.

■ *Scofield,* however, does not even suggest that a party who fails to intervene will be barred from instituting a subsequent § 301 action. In fact, that case clearly contemplates that § 301 suits can and will be filed subsequent to Court of Appeals review of a Board ruling. See 382 U.S. at 220, 86 S.Ct. 373. *Scofield* in no way suggested that intervention is considered either a sole remedy or a prerequisite to a subsequent § 301 action. None of the other cases cited by the defendant in any way support its position. We therefore conclude that plaintiff's failure to intervene in the Eighth Circuit review proceedings does not bar it from initiating the present § 301 action. Cf. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597–598, 68 S.Ct. 715, 92 L.Ed. 898 (1948).

■ We deal finally with plaintiff's prayer for attorneys' fees for the NLRB proceedings and appeal, and for the present § 301 action. With regard to the earlier litigation, this Court cannot award attorneys' fees since such awards could have been made contemporaneously by the NLRB, International Union of E., R. & M. R. v. NLRB, 138 U.S.App.D.C. 249, 426 F.2d 1243, 1253, n. 15 (1970), and the Court of Appeals, NLRB v. Smith & Wesson, 424 F.2d 1072 (1st Cir. 1970). Even assuming we had the power to award such fees, they would be justified only when the defendant's opposition in those proceedings was based on frivolous grounds. No such circumstances existed here. Similarly, we will not award attorneys' fees for the present § 301 action since we cannot find the defendant's refusal to arbitrate to be

frivolous or in bad faith. See Steel-workers v. Butler Manufacturing Co., 439 F.2d 1110 (8th Cir. 1971); and UMW v. Bowman Transportation, Inc., 421 F.2d 934 (5th Cir. 1970).

## IV.

For the reasons stated, it is

Ordered (1) that the defendant's motion for summary judgment should be and the same hereby is denied. It is further

Ordered (2) that the plaintiff's motion for summary judgment should be and the same hereby is granted. It is further

Ordered (3) that, consistent with this opinion, the parties shall present the two contested grievances to an arbitrator for resolution according to the procedures set forth in Section I, Article VI of the June 22, 1966 proposal. It is further

Ordered (4) that plaintiff's prayer for costs and attorneys' fees should be and the same hereby is denied.